IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:25-MC-4-RJ

JOHN DOE,

    Plaintiff,

v.

DISABILITY RIGHTS NORTH
CAROLINA,

    Defendant.

ORDER

This matter is before the court on the Doe Plaintiffs'[1] motion to compel third party Disability Rights North Carolina (Defendant in this action) to produce documents, and Disability Rights North Carolina's ("DRNC") motion to quash the subpoena served by the Doe Plaintiffs on January 13, 2025 and for a protective order. [DE-1, -9]. Both parties filed oppositions, [DE-11, -14], and the court held a hearing on the matters on March 21, 2025, as well as a status conference by telephone on April 14, 2025, [DE-15, -18, -19]. For the reasons that follow, the motion to compel is granted in part and denied in part, and the motion to quash and for a protective order is granted without prejudice to the Doe Plaintiffs' right to notice a future Rule 30(b)(6) deposition if necessary, or to DRNC's right to object to the same.

---

[1] At the March 21, 2025 hearing, the Doe Plaintiffs' counsel explained that he represents a putative class of Doe Plaintiffs; class certification in the underlying Middle District of North Carolina proceeding is pending. Hr'g Tr. [DE-18] at 13–14.

1

## I. Background

The motions before the court are related to a lawsuit currently pending in the Middle District of North Carolina, *Does v. North Carolina Department of Public Safety, et al.*, 1:24-CV-17 ("Middle District Action"). In the Middle District Action, as in this action, the Doe Plaintiffs are juveniles housed at various juvenile detention facilities across North Carolina, awaiting adjudication or conviction. Pls.' Mot. Ex. A [DE-1-1] ¶¶ 20–22. The Doe Plaintiffs have asserted causes of action on behalf of themselves and others similarly situated against, *inter alia*, the North Carolina Department of Public Safety ("DPS"), which operates the juvenile detention facilities in the state. *Id.* ¶¶ 23–26. Specifically, the Doe Plaintiffs allege that DPS has violated their rights under the Eighth and Fourteenth Amendments by keeping them in solitary confinement for extended periods of time, primarily for administrative convenience, which has had a deleterious effect on their mental health and deprived them of state-mandated educational services. *Id.* ¶¶ 27–234.

DRNC is not a party to the Middle District Action. Rather, DRNC is a non-profit organization designated by federal law as the Protection and Advocacy ("P&A") system for North Carolina. Marcus Decl. [DE-9-4] ¶¶ 3, 4. As the P&A for North Carolina, DRNC is authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state. *Id.* ¶ 5. Relevant here, part of DRNC's core responsibilities involves the monitoring of any place or facility in which a disabled person receives care or services, including juvenile detention centers and youth developmental centers operated by DPS. *Id.* ¶ 11; Grant Decl. [DE-9-5] ¶ 5; Nicholson Decl. [DE-9-6] ¶ 4; Story Decl. [DE-9-7] ¶ 7.

2

Given DRNC's access authority, the organization plays a unique role in monitoring the state's juvenile detention facilities. *See* Marcus Decl. [DE-9-4] ¶¶ 9–11; Grant Decl. [DE-9-5] ¶¶ 7–8; Nicholson Decl. [DE-9-6] ¶ 7; Story Decl. [DE-9-7] ¶ 10. According to DRNC, people with disabilities face discrimination in prison and jail in North Carolina, and youth placed in juvenile detention centers are no exception; such facilities often fail to provide necessary healthcare, education, support, and accommodations. Marcus Decl. [DE-9-4] ¶ 13. By entering juvenile detention facilities and speaking with juveniles and staff, DRNC is able to discover instances of abuse, neglect, exploitation, discrimination and any other breach of a disabled person's rights under state or federal law. *Id.* ¶ 11. Armed with this information, DRNC can then address these issues by advocating for compliance with the ADA and other legal protections, improved reentry and discharge services, better conditions, and systemic change through litigation and policy. *Id.*

Seeking information about the conditions of juvenile detention centers run by DPS and the use of solitary confinement at these facilities, as part of the Middle District Action between the Doe Plaintiffs and DPS, the Doe Plaintiffs served DRNC with a subpoena to produce the following documents (the "Document Subpoena"):

1. All documents and communications regarding any inspection, site visit, or other instance in which You were present at any Juvenile Detention Center, including but not limited to interview memoranda and other notes taken during or memorializing the results of such inspections or site visits.

2. Any reports or analyses, including drafts thereof, regarding any Juvenile Detention Center.

3. All documents and communications regarding the conditions at any Juvenile Detention Center, including, but not limited to, Solitary Confinement and provision of educational services.

4. All documents and communications regarding the mental health of any juveniles detained at any Juvenile Detention Center.

3

Pl.s' Mot. Ex. D [DE-1-4] at 10.² Of note, the Doe Plaintiffs limited the relevant time period for all requested documents from January 1, 2022 through the present. *Id.* at 6.

In the Middle District Action, the Doe Plaintiffs also served a subpoena upon DRNC to provide deposition testimony pursuant to Fed. R. Civ. P. 30(b)(6) with respect to the following topics (the "Deposition Subpoena"):

1. Any Inspection of any Juvenile Detention Center, including³

    a. The date of the Inspection;

    b. All individuals present at the Inspection;

    c. Whether You interviewed or otherwise met with juveniles during the Inspection and, if so, the number of juveniles You interviewed or otherwise met with during the Inspection;

    d. If You interviewed or otherwise met with juveniles during the Inspection, whether NCDPS or individuals representing any entity other than DRNC were present during those interviews;

    e. Any communications with NCDPS during the Inspection;

    f. The conditions of the Juvenile Detention Center during the Inspection;

    g. Your observations regarding the use of Solitary Confinement at the Juvenile Detention Center;

    h. Whether juveniles were restrained using shackles during Your Inspection;

    i. Whether juveniles were confined to their cells during Your Inspection;

    j. Whether juveniles ate meals in their cells during Your Inspection;

    k. Your observations regarding juveniles' access to educational services and related attendance; and

---

² This Order refers to the page number listed in the CM/ECF footer where, as here, that number differs from the document's internal pagination.

³ This topic has been narrowed for the sake of brevity to omit references to specific inspection dates.

4

1. Any monitoring debrief memos or other communications with NCDPS regarding the Inspection.

2. Any statements made to You by juveniles regarding the conditions of their confinement at any Juvenile Detention Center, including but not limited to statements regarding the following:

   a. The use of Solitary Confinement;

   b. The impact of Solitary Confinement on the juvenile's mental health, physical condition, or educational development;

   c. Whether juveniles eat meals in their cells;

   d. Juveniles' access to educational services; and

   e. Whether juveniles are restrained using shackles.

3. Your understanding of the use of Solitary Confinement at any Juvenile Detention Center.

4. Any concerns You raised to [Defendants in the Middle District Action] regarding the conditions at any Juvenile Detention Center, the use of Solitary Confinement at any Juvenile Detention Center, educational services provided to juveniles detained at any Juvenile Detention Center, or the mental health of any juveniles detained at any Juvenile Detention Center.

5. The response by [Defendants in the Middle District Action] to any concerns You raised regarding the conditions at any Juvenile Detention Center, the use of Solitary Confinement at any Juvenile Detention Center, educational services provided to juveniles detained at any Juvenile Detention Center, or the mental health of any juveniles detained at any Juvenile Detention Center.

6. Your understanding of the prevalence of mental health conditions and/or disabilities in the juveniles detained at Juvenile Detention Centers.

7. Your understanding of the impact of Solitary Confinement on the juveniles detained at Juvenile Detention Centers including but not limited to the impact of Solitary Confinement on the mental health, physical condition, or educational development of such juveniles.

Def.'s Mot. Ex. B [DE-9-2] at 9–12.

5

DRNC objects to both subpoenas in their entirety, which prompted the Doe Plaintiffs to file this action and the instant motion to compel. [DE-1]. DRNC responded in opposition to the motion to compel and filed a motion to quash the Deposition Subpoena and for a protective order against the same, which the Doe Plaintiffs oppose. [DE-9, -11, -14]. The court held a hearing on the pending motions on March 21, 2025, at which counsel for both parties appeared and presented arguments. [DE-15, -18]. The court also held a telephonic status conference on the motion to compel on April 14, 2025. [DE-19]. Notably, as confirmed by counsel for the Doe Plaintiffs at the April 14 status conference, the fact discovery deadline in the Middle District Action has been extended to May 14, 2025, though DPS's document production deadline was April 14, 2025.

## II. Discussion

Subpoenas issued to non-parties are governed by Rule 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 34(c) ("As provided in Rule 45, a nonparty may be compelled to produce a document and tangible things or to permit an inspection."). "In response to such a subpoena, a non-party may either file a motion to quash or modify the subpoena pursuant to Fed. R. Civ. P. 45(d)(3)(A), move for a protective order pursuant to Fed. R. Civ. P. 26(c), or oppose a motion to compel production of the subpoenaed documents pursuant to Fed. R. Civ. P. 45(d)(2)(B)." *Schaaf v. Smithkline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *United States v. Star Sci., Inc.*, 205 F. Supp. 2d 482, 484 (D. Md. 2002)); *Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2017 WL 5919625, at *4 (E.D.N.C. Nov. 30, 2017); *In re Nat'l Acad. of Scis.*, No. 7:24-MC-5-RJ, 2024 WL 3709862, at *3 (E.D.N.C. Aug. 6, 2024). In the instant case, the Doe Plaintiffs have moved to compel DRNC to respond to the Document Subpoena, and DRNC has moved to quash the Deposition Subpoena and for a protective order regarding the same. [DE-1]; [DE-9].

6

### A. The Doe Plaintiffs' Motion to Compel

Rule 45 adopts the standard codified in Rule 26 in determining what is discoverable. *Schaaf*, 233 F.R.D. at 453. In turn, Rule 26(b)(1) provides the following:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Importantly, though, as the Rule implies, just because "requested information is discoverable under Rule 26[(b)] does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004); *Artis v. Murphy-Brown LLC*, No. 7:14-CV-237-BR, 2018 WL 3352639, at *2 (E.D.N.C. July 9, 2018); *Jones v. Campbell Univ.*, No. 5:20-CV-29-BO, 2020 WL 4451173, at *2 (E.D.N.C. Aug. 3, 2020). Indeed, courts must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

"In the context of evaluating subpoenas issued to third parties, a court 'will give extra consideration to the objections of a non-party, non-fact witness in weighing burdensomeness versus relevance.'" *Schaaf*, 233 F.R.D. at 453 (quoting *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 426 (M.D.N.C. 2005)); *Eshelman*, 2017 WL 5919625, at *4. The determination of the reasonableness of a subpoena requires the court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it, weighing the benefits and burdens, considering whether the information is necessary and whether it is available from another source. *See* 9A Wright & Miller, Fed. Practice & Procedure § 2463.1 (3d ed.) (collecting cases); *Spring v. Bd. of Trs. of Cape Fear Cmty. Coll.*, No. 7:15-CV-84-BO,

7

2016 WL 4204153, at *1 (E.D.N.C. Aug. 8, 2016). Furthermore, the party seeking the court's protection from responding to discovery "must make a particularized showing of why discovery should be denied, and conclusory or generalized statements fail to satisfy this burden as a matter of law." *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010) (citation omitted); *see U.S. Equal Emp't Opportunity Comm'n v. Bojangles' Rests., Inc.*, No. 5:16-CV-654-BO, 2017 WL 2889493, at *3 (E.D.N.C. July 6, 2017) (citing *Papanicolas v. Project Execution & Control Consulting*, LLC, No. CIV.A. CBD-12-1579, 2015 WL 1242755, at *1 (D. Md. Mar. 17, 2015)) (noting that "[t]he burden of proving that a subpoena is oppressive is on the party moving to quash"); *Sherrill v. DIO Transp., Inc.*, 317 F.R.D. 609, 612 (D.S.C. 2016) ("[T]he burden of proof is with the party objecting to the discovery to establish that the challenged production should not be permitted.") (citation omitted).

Here, the Doe Plaintiffs argue that the court should compel DRNC to respond to the Document Subpoena because the subpoena seeks information that is relevant to the Middle District Action, particularly in light of DRNC's unique ability to access both the juvenile detention centers and the juveniles and staff present there; the subpoena is proportional given the vulnerability of the Doe Plaintiffs and the unsubstantiated burden claimed by DRNC; and DRNC's objections to the contrary are meritless. *Id.* DRNC responds that the motion to compel is premature given the parties' unsuccessful attempts to meet and confer; the Document Subpoena seeks information that is otherwise available to the Doe Plaintiffs via various discovery tools, such as a Rule 34 inspection of the juvenile detention centers; and the Document Subpoena imposes serious harms and burdens on a non-party, particularly considering the importance of confidentiality to DRNC's P&A role. Defs'. Resp. [DE-11] at 3–10.

Considering the parties' mutual but competing interests and their inability to resolve them,

8

at the March 21, 2025 hearing, the court solicited argument from counsel to expand on the claims made in their briefs. As anticipated, a recurring theme was the issue of confidentiality, particularly as it relates to DRNC's status as a P&A organization. Specifically, counsel for DRNC explained that under federal law, "[P&A] agencies like [DRNC] are obligated to maintain the confidentiality of information about individuals with disabilities, information that is provided to DRNC during the course of monitoring or other information provided for the record . . . confidential information includes requests for technical assistance from other attorneys and third parties." Hr'g Tr. [DE-18] at 4. Given these confidentiality limitations, DRNC contends that it has produced documents responsive to the Document Subpoena to the extent that it is able to, i.e., it has "produced documents that are nonconfidential and not sensitive." *Id.* at 6. DRNC argues that it is unable to produce any additional documents, even under a protective order, because it is the "watchdog" over DPS and the facilities that it operates, and "so if the watchdog is required to turn over sensitive and confidential information that gives insight into our strategy, our thinking, where we might monitor next, the protective order doesn't shield that information, does not keep the watchdog from telling the people that it's watching what it's doing." *Id.* at 5–6.

P&A organizations like DRNC exist at the nexus of federal law and regulations promulgated by the Department of Health and Human Services, and this court is not the first to confront the issue of disclosure of the confidential records they maintain. 45 C.F.R. § 1326.28; 42 U.S.C. § 10801, *et seq.*; 42 C.F.R. § 51.45; *see, e.g.*, *Woods Servs., Inc. v. Disability Advocs., Inc.*, Civil Action No. 18-296, 2018 WL 4932706, at *2 (E.D. Pa. Oct. 11, 2018); *Disability Rights Wa. v. Meneses*, No. 3:22-cv-05651-RJB, 2023 WL 6460982, at *2 (W.D. Wa. Oct. 4, 2023); *Disability Rights Wis., Inc. v. State Dep't of Pub. Instruction*, 463 F.3d 719, 728 (7th Cir. 2006). Notably, though, the issue of whether a nonparty P&A organization is obligated to disclose such records

9

when subpoenaed appears to be a novel one, and the court is mindful of the additional burdens DRNC asserts that it will bear under the circumstances. *See Schaaf*, 233 F.R.D. at 453. However, for the reasons described below, the court will grant the Doe Plaintiffs' motion to compel in part.

First and foremost, while DRNC correctly states that P&A agencies such as DRNC are under "an especially significant duty of confidentiality," Def.'s Resp. [DE-11] at 6 (quoting *Disability Rights Wis., Inc.*, 463 F.3d at 728), "confidential" does not necessarily mean "privileged."[4] *See Disability Rights Wa.*, 2023 WL 6460982, at *2 ("The regulation at issue, 45 C.F.R. § 1326.28, requires that protection and advocacy system entities, like the Plaintiff, keep certain information, for example, pertaining to clients and the identity of individuals who report abuse, 'confidential.' It does not create an evidentiary privilege.") (citing *Woods Servs. Inc.*, 2018 WL 4932706, at *2); *see also In Re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487, 492–93 (5th Cir. 1996) (citing cases); *Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000) ("Statutory provisions providing for duties of confidentiality do not automatically imply the creation of evidentiary privileges binding on courts."); *C.R. v. Novi Commun. Sch. Dist.*, No. 14-14531, 2016 WL 126250, at *2 n.4 (E.D. Mich. Jan. 12, 2016) ("Statutory confidentiality provisions such as those under FERPA and HIPAA do not create evidentiary privileges.") (citation omitted).

Secondly, even if DRNC is required to produce confidential information in the litigation context, there is already a protective order in place in the Middle District Action. Pls.' Mot. Ex. G [DE-1-7]. That order provides, *inter alia*, for the confidential disclosure of protected health

---

[4] Moreover, *Disability Rights Wisconsin, Inc.*, which DRNC cites in its brief to argue for a heightened level of confidentiality disfavoring nearly any amount of disclosure, *see* Def.'s Resp. [DE-11] at 6–7, is inapposite here. As the *Woods Services, Inc.* court explained, in *Disability Rights Wisconsin*, the court analyzed whether a P&A system "was entitled to discovery of certain records maintained by the Wisconsin Department of Public Instruction, . . . [but in the instant case] Defendant is not seeking to obtain another party's confidential records, but rather is seeking to shield its own confidential records from the discovery process." 2018 WL 4932706, at *3.

10

information and other information "that is invasive of the privacy of a person not a party to this litigation," and mandates that certain confidential information is subject to an "Attorneys' Eyes Only" classification, including certain personally identifiable information and security information. *Id.* at 3–4.

Third, to the extent that DRNC contends that those protections entered in the Middle District Action are inadequate, the Doe Plaintiffs' counsel has expressed a willingness to work with DRNC on crafting a mutually agreeable solution. Hr'g Tr [DE-18] at 20 ("We've offered to DRNC to redact the names of the kids. If they're worried about under the P and A statutes the confidentiality of the kids' names, we don't want the kids' names."); *id.* ("We've got a protective order [in the Middle District Action] . . . . And if it somehow doesn't protect enough, we'd be happy to try to work with DRNC and go to the court in the underlying case and either amend the protective order or get a new protective order to protect against . . . whatever they think is not covered."); *id.* at 32 ("[I]f there is something so confidential that they think even a confidentiality provision and designation would not protect it, . . . we're willing to talk about whether we need to amend the protective order to add an attorneys' eyes only [provision]"). Thus, while there is no doubt that the records and information DRNC collects during an investigation are confidential and entitled to some protection, DRNC has presented no compelling reason why the protections already in place—or that might reasonably be put into place with the cooperation of the Doe Plaintiffs' counsel—are insufficient under the law.

Fourth and finally, DRNC has not met its burden of showing that the Document Subpoena is oppressive, despite the organization's nonparty status. *See Mainstreet Collection, Inc.*, 270 F.R.D. at 240; *In Re Nat'l Academy of Scis.*, No. 7:24-MC-5-RJ, 2024 WL 3709862, at *5–7 (E.D.N.C. Aug. 6, 2024). In its brief and at the hearing, DRNC argued

11

that the Doe Plaintiffs seek information via the Document Subpoena that is otherwise available to them: namely, they may use, and have used, Rule 34 inspections of the juvenile detention centers; they may work with their co-counsel in the Middle District Action, the Council for Children's Rights, to access these facilities and speak with their clients; they may seek the opinion of their retained expert, rather than attempting to use DRNC as an unretained expert; and they may obtain the consent of the juveniles' parents and guardians and arrange to speak with them directly, as the court required in the Middle District Action. Def.'s Resp. [DE-11] at 3–5; Hr'g Tr. [DE-18] at 14–23, 29–30, 36–37, 39. DRNC also argued that complying with the Document Subpoena would be harmful to the organization because some of the juveniles held in the detention centers are past and current clients, and their records are subject to the attorney-client privilege and/or considered attorney work product; disclosing internal documents and communications to the agency they are in charge of monitoring would negatively impact DRNC and its oversight; disclosing confidential information would impact DRNC's ability to obtain additional confidential communications and build relationships with juveniles in these facilities in the future; and parsing through the juveniles' records and redacting identifying information would take up valuable attorney time and resources. Def.'s Resp. [DE-11] at 5–10; Hr'g Tr. [DE-187] at 16–17, 24–27, 34–36, 39–40.

Turning first to DRNC's claims that the information the Doe Plaintiffs seek through the Document Subpoena is available to them through other means, the Doe Plaintiffs' counsel's hearing statements plainly indicate that this is not the case. At the hearing, counsel explained that because of DRNC's P&A status, no other entity possesses or can access the breadth of information that DRNC has within its reach. Hr'g Tr. [DE-18] at 8–9; 12–14. Counsel stated that, as far as he is aware, only DRNC has the authority to access all ten juvenile detention centers across North Carolina, as well as the ability to meet with the juveniles and staff members present at these

12

facilities at any given time. *Id.* at 12–13. As a result, only DRNC has records, both historical and from the present day, concerning many of the juveniles who have been housed at juvenile detention centers across the state. *Id.* The Doe Plaintiffs' counsel stated that, given the nature of the Middle District Action and pending class certification, efforts to obtain similar records from other sources are not viable; the population of juveniles housed in detention facilities is simply too transient, and there is no other consistent institutional presence that has been able to observe the conditions of the facilities firsthand, as well as their impact on potentially hundreds of juveniles. *See id.* at 19–20 (stating that the Council for Children's Rights is the *de facto* public defender for juveniles in Mecklenburg County, their facility access is limited, and they do not serve the same monitoring function or level of access); 30–31 (explaining that to inspect juvenile detention facilities and interview juveniles during inspection, parental consent required, but "no law of the case that says [Doe Plaintiffs] cannot get documents from other organizations that reference discussions with those kids."); 31 (explaining that expert included in class certification briefing filed declaration regarding basis of his opinion, but DPS "largely denied the idea that there was any solitary confinement going on for significant periods of time," so expert "absolutely needs" additional information to refute this).

Notably, DRNC did not deny its unique access authority or the fact that the organization maintains documents regarding its interactions with individual juveniles and staff members that are undisclosed to DPS. Instead, DRNC continued to appeal to the confidentiality provided to a P&A system and its recordkeeping practices, and argued that it has produced non-confidential, non-sensitive documents that comply with the subpoena. *See id.* at 5–6. However, as explained *infra*, confidentiality may be preserved here even if it is necessary for DRNC to produce additional documents. And considering that counsel for the Doe Plaintiffs explained at the hearing that the

13

memos that have been produced by DRNC are "very high-level summaries" that do not contain the full scope of information sought by the Doe Plaintiffs, *id.* at 11, the court finds that while the Doe Plaintiffs may be able to obtain some of the information it needs from other sources, the Document Subpoena does not inherently burden DRNC.

With respect to DRNC's claim that complying with the Document Subpoena would be harmful to both DRNC and its clients, the court is mindful of the importance of confidentiality to DRNC's P&A role, as well as the attorney-client relationship the organization maintains with some of the juveniles housed at detention centers throughout North Carolina. Given these concerns and the uncertainty surrounding the availability of certain documents, the court held a status conference on April 14 to delve further into this issue. [DE-19]. At the status conference, counsel for DRNC explained that monitoring juvenile detention centers only became a primary focus of the organization in 2024; most of DRNC's potentially relevant records from facility visits consist of handwritten notes taken by DRNC attorneys and advocates, as well as correspondence with the juvenile detention centers prior to individual site visits; and without comparing notes taken with client files, it is difficult to estimate what proportion of DRNC's records would involve attorney-client privilege concerns.

Based on the information discussed above and gleaned at the status conference, the court in its discretion finds that even giving extra consideration to DRNC's objections, the interests furthered by requiring some production of documents remain more significant than those furthered by denying the motion to compel altogether. *See Schaaf*, 233 F.R.D. at 453. However, noting the sensitivity of the information subject to disclosure and the parties involved in the Middle District Action, tempering the Doe Plaintiffs' existing document requests is appropriate. Accordingly, the parties shall work together to produce a mutually agreeable protective order that includes an

14

Attorney's Eyes Only provision governing the documents to be produced by no later than **April 28, 2025**. Furthermore, by no later than **May 12, 2025**, DRNC shall, subject to the terms of that protective order, produce notes or portions of notes taken by DRNC attorneys and advocates during visits to juvenile detention centers in 2024, provided that 1) the notes or portions of notes contain descriptions of solitary confinement and/or solitary-confinement-like conditions or their impact on the juveniles experiencing them, and 2) they are not shielded by the attorney-client privilege or work-product doctrine.

### B. Motion to Quash and for a Protective Order

DRNC requests that the court quash the Deposition Subpoena served to the organization on January 13, 2025 and enter a protective order regarding the same. [DE-9]. In support, DRNC raises many of the confidentiality concerns described in the previous section and particularly highlights the scope of the noticed Rule 30(b)(6) deposition, its de facto positioning of DRNC as an unretained expert witness, and the undue burden it imposes on the organization given the alternative methods available to the Doe Plaintiffs for obtaining this information. Def.'s Mem. [DE-10] at 4–10. The Doe Plaintiffs, likewise incorporating many of the arguments previously addressed with respect to the Document Subpoena, counter that most of the information sought by the subpoena is not confidential, the P&A statues do not establish evidentiary privileges, the protective order entered in the Middle District Action adequately addresses DRNC's confidentiality concerns, the discovery sought is proportional to any burden the subpoena might impose on DRNC, and the subpoena does not seek to make DRNC an unretained expert witness. Pls.' Resp. [DE-14] at 3–10.

At the March 25 hearing, counsel for the Doe Plaintiffs explained that "the idea behind the 30(b)(6) deposition was if we're not going to get any documents, we're going to need to talk to

15

someone who would understand and who could testify as to what happened during those monitoring visits so we could get information with respect to solitary confinement." Hr'g Tr. [DE-18] at 52–53. Then, after the court asked whether receiving additional documents from DRNC as requested would obviate the need for a deposition, counsel answered, "I don't know . . . . I don't know what's in the documents, nor do I really understand the categories [of documents] they have." *Id.* at 53. Given that DRNC has now been ordered to produce some documents by May 12, 2025, and that those documents might feasibly eliminate the need to depose anyone on behalf of DRNC, a nonparty, the existing Deposition Subpoena is quashed without prejudice, and it is unnecessary to enter a protective order limiting its scope. Should the Doe Plaintiffs deem it necessary to depose a DRNC representative after reviewing the documents produced, they may re-notice a deposition, and DRNC may take the action it deems appropriate under the circumstances.

## III. Conclusion

For the reasons stated above, the Doe Plaintiffs' motion to compel, [DE-1], is allowed in part and denied in part, and DRNC's motion to quash and for entry of a protective order, [DE-9], is allowed. The parties shall work together to produce a mutually agreeable protective order that includes an Attorney's Eyes Only provision governing the documents to be produced by DRNC by no later than **April 28, 2025**. Additionally, by no later than **May 12, 2025**, DRNC shall, subject to the terms of that protective order, produce notes or portions of notes taken by DRNC attorneys and advocates during visits to DPS-operated juvenile detention centers in 2024, provided that 1) the notes or portions of notes contain descriptions of solitary confinement and/or solitary-confinement-like conditions or their impact on the juveniles experiencing them, and 2) they are not shielded by the attorney-client privilege or work-product doctrine.

16

Case 5:25-mc-00004-RJ    Document 20    Filed 04/22/25    Page 16 of 17

SO ORDERED, the 21 day of April 2025.

_____
Robert B. Jones, Jr.
United States Magistrate Judge

17